[No. E005787. Fourth Dist., Div. Two. Aug. 16, 1989.]

CALIFORNIA CONCRETE CO., INC., Plaintiff and Appellant, v. BEVERLY HILLS SAVINGS AND LOAN ASSOCIATION, Defendant and Respondent.

**COUNSEL**

Cantor & Weinshenk and Jon D. Cantor for Plaintiff and Appellant.

Holzwarth, Powell, Stein & Parilla, Michael R. Tenerelli and Raymond P. Mulligan for Defendant and Respondent.

## OPINION

McDANIEL, J.—Plaintiff California Concrete Co., Inc. (California Concrete), has appealed from a judgment in favor of defendant Beverly Hills Savings & Loan Association, a *federal savings and loan association* (Beverly Hills Savings), following the granting of Beverly Hills Savings' motion for summary judgment.

### FACTS

In 1981, Beverly Hills Savings and Loan, *a California corporation* (Beverly Hills S & L) (not to be confused with Beverly Hills Savings, a federal savings and loan association), entered into a $13,650,000 construction loan agreement with Village Racquet Club Associates, a California limited partnership (Village Associates). Village Associates intended to construct a 140-unit condominium project on land which it had leased in Riverside County.

The construction loan was evidenced by a promissory note, secured by a leasehold deed of trust and by an assignment of rents and a security agreement, which constituted a first lien on Village Associates' leasehold estate and on the project. The deed of trust provided, in pertinent part, that:

"Upon request of Borrower, Lender, at Lender's option so long as this instrument secures indebtedness held by Lender, may make future advances to Borrower. Such future advances, with interest thereon, shall be secured by this instrument and evidenced by promissory notes stating that said notes are secured thereby."

Thereafter, Village Associates, which was acting as the owner-builder on the project, entered into three separate subcontract agreements with California Concrete whereby California Concrete agreed to supply labor and materials for the project. The consideration which California Concrete was to receive under these subcontract agreements totaled $700,000.

In 1983, Beverly Hills S & L notified Village Associates that Village Associates was in default under the terms of the construction loan agreement, because, among other things, it had failed, and was continuing to fail, to complete the works of improvement in a prompt and workmanlike manner. Despite the fact that Village Associates was in default, Beverly Hills S & L agreed, in order to preserve the project, to lend Village Associates additional construction funds. These latter advances were evidenced by promissory notes which each provided, in relevant part, that: ". . . such additional loan shall be consolidated with and added to the unpaid balance

of the loan numbered in the caption . . . and . . . shall be subject to all of the terms and conditions of the Note or Notes evidencing said loan, and shall be secured by the Deed of Trust securing same, dated March 19, 1981, executed by [Village Associates] . . . and recorded on 3/27/81."

Some six months later, Village Associates had still not cured its default under the terms of the construction loan. As a consequence, on December 5, 1983, Beverly Hills S & L recorded a notice of default and election to sell under its deed of trust.

On December 21, 1983, William Gagne, Beverly Hills S & L's vice-president, sent Village Associates' subcontractors a mailgram which stated that on December 16, 1983, a receiver had been appointed by the court to handle and approve all matters related to the project. This mailgram also stated that "Barring complications, Beverly Hills Savings [the California corporation, not the federal savings and loan association] intends to pay outstanding invoices and continue until construction on all 4 phases is completed. The first step I propose is a general meeting of all subcontractors. . . ." On January 13, 1984, Beverly Hills S & L obtained an order confirming the appointment of a receiver who was to undertake the necessary steps to complete construction of the project.

One of California Concrete's employees attended a meeting of subcontractors at which the subcontractors were orally assured by Gary Levy, a representative from Beverly Hills S & L, that as long as the subcontractors fulfilled their obligations and did not raise their prices, they would be paid. Apparently, at this point California Concrete had already completed performance under its written agreement with Village Associates, and thus the additional labor and materials it was asked to provide could be characterized as "extras" which would be provided pursuant to the same terms as the written agreement.

The project was eventually completed in April 1984. Meanwhile, Village Associates had failed to make all payments called for under its subcontract agreement with California Concrete. On or about April 25, California Concrete recorded a mechanic's lien on the property, and on July 5, 1984, it filed a complaint against Beverly Hills S & L for foreclosure of mechanic's lien, surety on principal obligation, guaranty of collectability and misrepresentation. This complaint alleged in the first cause of action that the sum of $208,552.57 was due and owing under the subcontract agreements, that California Concrete had recorded a mechanic's lien against the project, and that Beverly Hills S & L claimed to have some right, title or interest in or to the project.

The second cause of action alleged that when Village Associates had been in default on its loan from Beverly Hills S & L, Beverly Hills S & L, as a prerequisite to "reinstating" the loan, had required that Village Associates' creditors forgo institution of any legal action against Village Associates, and that California Concrete and Beverly Hills S & L had orally agreed that California Concrete would not institute legal action to collect monies owed to it by Village Associates in exchange for Beverly Hills S & L's assurance that the monies owed by Village Associates would be paid.

The third cause of action alleged that Beverly Hills S & L represented to California Concrete, if California Concrete would defer bringing legal action against Village Associates, that the obligations of Village Associates would remain good and collectible, and that this representation constituted a guarantee of the debt, in consideration of which California Concrete agreed to forbear exercising its legal rights. The third cause of action also alleged that Village Associates had filed under chapter 7 of the Bankruptcy Act, had listed California Concrete as an unsecured creditor, and had asked that the debt owed to California Concrete be discharged in bankruptcy.

The fourth cause of action alleged that Beverly Hills S & L had promised, if California Concrete did not institute legal action, that the former would nonetheless be paid the monies due the latter, and that Beverly Hills S & L made this promise with the knowledge, or with reason to know, that California Concrete would rely on this promise. The fourth cause of action also alleged that California Concrete did reasonably rely on this promise and that therefore it had been damaged. This cause of action was entitled "promissory estoppel."

The fifth cause of action alleged that Beverly Hills S & L's assurances that California Concrete would be paid were made with knowledge that they were untrue or unlikely, and that they were made for the purpose of allowing Beverly Hills S & L to proceed with foreclosure of its security not trammeled by any action of California Concrete to protect its interests.

Beverly Hills S & L answered with a general denial and raised 27 affirmative defenses. Thereafter, California Concrete filed a first amended complaint, to which the original answer was stipulated to apply.

In April 1985, the Federal Home Loan Bank Board appointed the Federal Savings and Loan Insurance Corporation (FSLIC) as receiver for Beverly Hills S & L. FSLIC then organized a new corporation, Beverly Hills *Federal* Savings and Loan Association, which later changed its name to "Beverly Hills Savings, a Federal Savings and Loan Association." This new entity is

herein referred to as "Beverly Hills Savings," and is the respondent to this appeal. The current status of Beverly Hills S & L, the California corporation, is unknown, for both parties to this appeal, surprisingly, have failed to take into consideration the fact that the California corporation and the federal association might have different positions vis-à-vis this lawsuit.

At this point in our recitation of the facts, we pause for a brief digression to note the practices of FSLIC. FSLIC was created by the federal government for the purpose of insuring the accounts of eligible savings and loan associations. (12 C.J.S., Building & Loan Assoc., § 8, p. 763.) In connection with this purpose, FSLIC is authorized to make regulations related to loans which may be made by insured institutions, may initiate administrative proceedings to deal with unsafe or unsound banking practices, may issue temporary cease and desist orders, and may order the suspension or removal of banking officials who have engaged in improper practices. (*Ibid.*)

In addition, when an insured institution is in financial difficulty, i.e., insolvent, FSLIC may act as a conservator, receiver, or other legal custodian of the institution. (12 U.S.C.A. § 1729(c).) When FSLIC acts as a receiver, its powers include taking over the assets and operation of the association, taking whatever action is necessary to put it into a solvent position, or liquidating its assets in an orderly manner. (12 U.S.C.A. § 1729(b), (c); 12A C.J.S., Building & Loan Assn., *supra*, § 133, at p. 101.) In connection with the liquidation of an insolvent institution, FSLIC is authorized to settle, compromise and release claims in favor of or against the institution. (12 U.S.C.A. § 1729(d); 12A C.J.S. § 141, at p. 115.) FSLIC may also choose to merge the insolvent institution with another insured institution. (12 U.S.C.A. § 1729(b), (c); 12A C.J.S. § 141, at p. 115.)

A savings institution organized under state law, under the proper circumstances, may be converted into a federal savings and loan association. (12A C.J.S., Building & Loan Assn., *supra*, § 145, at pp. 129-130.) A state savings and loan association may also merge with another institution, or it may sell its assets to another institution, or allow another institution to assume its business. (12A C.J.S. § 146.) When an institution has been formed by a merger, the newly created institution becomes liable for the valid debts of the old institution, even if it did not assume them under the merger agreement. (12A C.J.S. § 146, at p. 134.) Also after a merger, the former institution ceases to exist, and any actions must be brought against the consolidated institution. (12A C.J.S. § 146, at pp. 133-134.)

As noted above, FSLIC may choose to merge the insolvent institution with another institution, or it may simply decide to sell off the insolvent

institution's assets. What sometimes occurs is that the insolvent institution's worthwhile assets are spun off to the new institution, while FSLIC, in its corporate capacity, retains the liabilities and less promising assets of the insolvent institution. The result of this federally protected division of assets and liabilities may result in a situation in which the new institution may be pursuing a debtor to collect on an obligation which it took as one of the insolvent institution's assets, while the debtor is forced to pursue any related counterclaims against FSLIC through administrative channels. (See, e.g., *Federal Deposit Ins. Corp.* v. *First Mortg. Inv.* (E.D.Wis. 1980) 485 F.Supp. 445.) An appropriate method for determining which assets and liabilities have been assumed by the new institution is to review the documents by which the new institution is created and/or the insolvent institution's assets and liabilities are distributed.

As is apparent from the above discussion, the rights and obligations of a "new" institution will depend on the circumstances under which it was created and/or the arrangement by which it acquired any assets and/or liabilities of the "old" institution.

■ In any event, the new institution is a separate and distinct entity from the old. *Thus, it must be named as a party if it is to be made part of any lawsuit involving its assets. If it wishes to become a party in a lawsuit involving the assets and obligations of the old institution, it must take the appropriate procedural steps, i.e., it must seek leave to intervene.* (See 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 246, p. 301; Code Civ. Proc., § 387, subd. (a).) Alternatively, the insolvent institution, if it is no longer legally responsible for the claim involved in a given lawsuit, may apply for an order substituting the new institution in as the proper defendant. (See 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 269 et seq., p. 328 et seq.; Code Civ. Proc., § 386 subd. (a).) A plaintiff may also seek to amend a complaint to substitute in a proper defendant. (See 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 1150, p. 568.) *The result of following these procedures is that the basis upon which the new institution is claimed to be a proper party to the lawsuit, e.g., the type of interest it has in the claim upon which the action is based, is made known to all parties to the action.*

It is indeed remarkable, as far as can be discerned from the record on appeal, that *none of these procedures was ever followed here.* Instead, Beverly Hills Savings, which had never been named as a party, and *which to this day is not named as a party,* simply began participating in the lawsuit, as set out below. ■ We do not mean to suggest, by pointing this out, that Beverly Hills Savings is not bound by any adjudications made in this case, for by voluntarily intruding in the lawsuit, Beverly Hills Savings has consented to

the court's jurisdiction over its corporate being. (See 2 Witkin, Cal. Procedure (3d ed. 1985) Jurisdiction, § 147 p. 531.) We call attention to its gratuitous intrusion into this litigation as a basis for observing that such intrusion is a source of much of the confusion relating to or arising from Beverly Hills Savings' belated attempt to insert into this action a defense grounded upon federal law related to banking institutions which have been taken over by a federal agency such as FSLIC.

In September 1986, Beverly Hills Savings moved for summary adjudication of issues. The motion was granted, and the order granting the motion included a finding that the construction loan made by Beverly Hills S & L and secured by a deed of trust had priority over California Concrete's mechanic's lien.

In June 1987, California Concrete filed a second amended complaint against Beverly Hills S & L and others (but not against Beverly Hills Savings), alleging a total of 14 causes of action, several of which were based upon allegedly newly discovered facts supposedly arising from the same transaction and occurrence as referred to in the original complaint. These causes of action were denominated as follows:

(1) for breach of written agreements;

(2) for money had and received;

(3) for work, labor and materials at an agreed price;

(4) for work, labor and materials furnished—reasonable value thereof;

(5) for account stated;

(6) for foreclosure of mechanic's lien;

(7) for payment on contractor's payment bond;

(8) for surety on principal obligation;

(9) for guarantee of collectability;

(10) for promissory estoppel;

(11) for intentional misrepresentation;

(12) for intentional misrepresentation;

(13) for intentional misrepresentation; and

(14) for conspiracy to defraud.

The second amended complaint was answered by "Beverly Hills Savings, a federal Savings and Loan Association, successor-in-interest to Beverly Hills Savings and Loan Association, a California corporation, . . ." The answer to the second amended complaint consisted of a general denial and 11 affirmative defenses, including the following affirmative defense: "This answering defendant is informed and believes, and on the basis of such information and belief alleges, that if Plaintiff has suffered any damages or losses whatsoever, said damages and losses were and are the proximate and immediate result of a breach, failure, neglect, omission, error, negligence, actions and/or inactions of Plaintiff, and/or Plaintiff's respective agents, and/or parties other than this answering Defendant, for which this answering Defendant is not responsible."

Beverly Hills Savings' answer to the second amended complaint did *not* include any defense related to the statute of frauds, nor did it include any defense based on a federal statute.

About one year after filing its answer to the second amended complaint, Beverly Hills Savings moved for summary judgment or, alternatively, for summary adjudication of specified issues. Beverly Hills Savings asserted several theories under which it claimed to be entitled to summary judgment in its favor: (1) that federal law (12 U.S.C. § 1823 and *D'Oench, Duhme & Co.* v. *F.D.I.C.* (1942) 315 U.S. 447 [86 L.Ed. 956, 62 S.Ct. 676] and related cases) barred California Concrete, as a matter of law, from asserting any claims against the newly organized institution; (2) that California mechanic lien law barred California Concrete's second through fourth causes of action; (3) that California Concrete's surety claim was barred by the statute of frauds; and (4) that California Concrete was barred from foreclosing on its mechanic's lien because Beverly Hills S & L's deed of trust (which is apparently one of the assets acquired by Beverly Hills Savings from FSLIC) had priority over California Concrete's mechanic's lien. Notably, this motion did not address the causes of action related to misrepresentations purportedly made by Beverly Hills S & L and to the purported conspiracy to defraud.

California Concrete opposed the motion for summary judgment, asserting that: (1) Beverly Hills Savings had waived its right to rely on 12 United States Code section 1823 by failing to raise the statute as an affirmative defense; (2) 12 United States Code section 1823, in any event, was not

applicable to the facts of this case; (3) Beverly Hills Savings had failed to supply the court with sufficient evidentiary facts to support its reliance on 12 United States Code section 1823 as a defense; (4) having waived the statute as a defense, Beverly Hills Savings could only rely on federal common law, which indicated that (a) Beverly Hills Savings had waived the statutory defense by failing to assert it by way of answer, (b) the defense provided by the statute only applied to Federal Deposit Insurance Corporation (FDIC) cases, not to FSLIC cases, and (c) Beverly Hills Savings had failed to establish the evidentiary elements to the statutory defense; (5) the second through fourth causes of action adequately alleged a theory under which Beverly Hills S & L could be held liable under the subcontract agreements; (6) there was sufficient evidence, unrefuted by Beverly Hills Savings, of a writing sufficient to satisfy the statute of frauds in the surety or guaranty causes of action; and (7) the sixth cause of action for foreclosure of the mechanic's lien was addressed only to the discretionary disbursements made by Beverly Hills S & L after it had obtained the subcontractors' agreement to continue providing materials to the project by promising that they would be paid, and thus the seniority of the construction loan was irrelevant.

The trial court granted the motion for summary judgment, and entered judgment in favor of "Beverly Hills Savings, a federal savings and loan association," apparently on all causes of action.[1] California Concrete filed a timely appeal, asserting on appeal only those arguments related to section 1823 and federal common law involving the same elements as set out in section 1823.

DISCUSSION

*Did Beverly Hills Savings Waive Its Statutory Defense?*

■ Beverly Hills Savings takes the picturesque position that it somehow put California Concrete "on notice" of its statutory defense (12 U.S.C. § 1823) by answering the second amended complaint as "Beverly Hills Savings, a federal Savings and Loan Association, successor-in-interest to Beverly Hills Savings and Loan Association, a California corporation, . . .", and by raising the affirmative defense noted above, i.e., "This answering defendant is informed and believes, and on the basis of such information

---

[1] We say "apparently," because (1) Beverly Hills Savings, not having been named as a party, was therefore not named in each cause of action as a defendant to which this particular cause of action applied, and (2) Beverly Hills Savings' motion for summary judgment did not indicate that it was addressed to all 14 causes of action, and did not specify why it was entitled to summary judgment on each cause of action, but did ask for, implicitly, summary judgment as to the whole complaint.

and belief alleges, that if Plaintiff has suffered any damages or losses whatsoever, said damages and losses were and are the proximate and immediate result of a breach, failure, neglect, omission, error, negligence, actions and/or inactions of Plaintiff, and/or Plaintiff's respective agents, and/or parties other than this answering Defendant, for which this answering Defendant is not responsible."

According to Beverly Hills Savings, this information should have prompted California Concrete to initiate discovery and thereby to discover not only that Beverly Hills S & L had been taken over by FSLIC, but that its assets and liabilities, including California Concrete's claim, had been distributed in a manner which would give Beverly Hills Savings sufficient interest in the subject matter of the lawsuit that it should be a party, and that Beverly Hills Savings, based on such circumstances, intended to rely on 12 United States Code section 1823(e), which provides, in relevant part: "No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank."[2]

It is plain beyond any possible refutation that Beverly Hills Savings' answer to the second amended complaint in no way raised either 12 United States Code section 1823 or any of the four elements on which it is based as a defense. In fact, the answer did not even raise the related and relatively straightforward defense of the statute of frauds.

Furthermore, the fact that Beverly Hills Savings claimed to be the "successor-in-interest" of Beverly Hills S & L, rather than putting California Concrete on notice that Beverly Hills Savings might raise the technical and statutory defense of 12 United States Code section 1823, was more likely to have had just the *opposite* effect. Beverly Hills S & L could not itself have

[2] We note that section 1823 is part of the Federal Deposit Insurance Act, and the "Corporation" referred to in section 1823 is FDIC, not FSLIC. (12 U.S.C. § 1811.) FDIC and FSLIC are two wholly separate government insuring agencies. (*North New York Sav. Bank* v. *Federal S. & L. Ins. Corp.* (D.C. Cir.1975) 515 F.2d 1355 [169 App.D.C. 384].) Beverly Hills Savings nevertheless contends that this defense is available in similar situations involving FSLIC. Because we have concluded this defense was waived, we need not determine whether Beverly Hills Savings' contention is correct.

asserted section 1823 as a defense to California Concrete's claim, for the section, by its own terms, is only called into play when the *FDIC* has acquired the assets and liabilities of a troubled institution, and has either retained them or transferred them to another institution. A "successor-in-interest," however, is defined as: "One who follows another in ownership or control of property. In order to be a 'successor in interest,' *a party must continue to retain the same rights as original owner without change in ownership and there must be change in form only and not in substance, and transferee is not a 'successor in interest.'* [Citation.] In case of corporations, the term 'successor in interest' ordinarily indicates statutory successor as, for instance, when corporation changes its name but retains same property. [Citation.]" (Black's Law Dict. (5th ed. 1979) p. 1283, col. b—p. 1284, col. a, italics added.)

 Thus, Beverly Hills Savings' characterization of its position as that of a "successor-in-interest" would, if anything, have lulled California Concrete into the belief that Beverly Hills Savings' rights in regard to the project were exactly the same as those of Beverly Hills S & L, and, e.g., that Beverly Hills Savings would not be entitled to assert any defenses to the claim which could not have been asserted by its purported predecessor in interest.

Having determined that Beverly Hills Savings did not adequately plead, either explicitly or implicitly, the defense upon which much of its motion for summary judgment was premised, we next address whether its failure to do so resulted in a waiver of that defense.

 Although amendments of pleadings are to be liberally allowed in the interest of justice (*Dairy Engineering Corporation* v. *De-Raef Corporation* (W.D.Mo. 1942) 2 F.R.D. 378), under both state and federal rules of procedure, the failure to raise a particular defense at the earliest possible time may result in a waiver of the defense. For example, in *Girardi* v. *Gates Rubber Company Sales Division* (N.D.Cal. 1965) 253 F.Supp. 690, defendant failed to raise the statute of limitations as a defense for more than six years, and then asserted it in connection with a motion for summary judgment, after plaintiff had incurred significant time and expense in the course of litigation, including the cost of a trial and an appeal. Held, defendant had waived its right to raise the statute as a defense. In *Basko* v. *Winthrop Laboratories, Inc.* (D.C.Conn. 1967) 268 F.Supp. 26, a delay of nine months before defendant sought to amend its complaint to raise the statute of limitations as a defense was held to be too long, and defendant was held to have waived the defense. In *Radio Corporation of America* v. *Radio Station KYFM, Inc.* (10th Cir. 1970) 424 F.2d 14, various affirmative defenses,

including the statute of frauds, were held to have been waived when they had not been set forth in the third parties' complaint or tried by express or implied consent. In *Automatic Paper Machinery Co.* v. *Marcalus Mfg. Co.* (D.C.N.J. 1944) 54 F.Supp. 105, reversed on other grounds (3d Cir. 1945) 147 F.2d 608, affirmed (1945) 326 U.S. 249 [90 L.Ed. 47, 66 S.Ct. 101], it was held defendants were not entitled to amend their answer when they first raised the defenses of laches and estoppel in answer to plaintiff's motion for summary judgment.

■ Here, Beverly Hills Savings was involved in this action for about two years before it raised 12 United States Code section 1823 as a defense. It waited for a year after filing its answer to the second amended complaint before raising this defense, and then it did so not by seeking leave to amend its answer to add the defense (which would have required it to explain why it had not asserted the defense in its original answer, and why California Concrete would not be prejudiced if it were allowed to amend), a procedure which would have then given California Concrete some time to investigate the facts and law related to the defense, but instead by raising the defense "offensively" in a motion for summary judgment. Then, when California Concrete objected to this use of an unpleaded affirmative defense, rather than withdrawing its motion and seeking leave to amend its answer, it chose to stand upon its answer as pled and to force California Concrete to undertake the time and expense involved in responding to the motion for summary judgment and later in prosecuting an appeal. Given these facts, we hold, as a matter of law, that Beverly Hills Savings waived the defense provided by section 1823.

Having determined that Beverly Hills Savings waived any defense based on section 1823, we need not consider the related issues raised on appeal, i.e., (1) whether 12 United States Code section 1823, in any event, was applicable to the facts of this case, and (2) whether Beverly Hills Savings had failed to supply the court with sufficient evidentiary facts to support its reliance on 12 United States Code section 1823 as a defense. As to the issue of whether, having waived the statute as a defense, Beverly Hills Savings could nonetheless rely on federal common law to the same effect as section 1823, we hold that Beverly Hills Savings' failure to raise the elements of such common law defense in its answer is equally fatal to any belated effort to rely on it now.

■ As noted above, on appeal, California Concrete has not asserted that the trial court erred by ruling against California Concrete on any of the other issues it raised in opposition to the motion for summary judgment, i.e., the sufficiency of the second through the fourth causes of action, the sufficiency of the sixth cause of action, and the sufficiency of the surety and

guaranty causes of action (the eighth and ninth causes of action). Thus, California Concrete has abandoned these issues and we must affirm the trial court's determination as to those causes of action.

## DISPOSITION

The judgment is reversed. The trial court is directed to vacate the order of July 12, 1988, and to enter a new and different order granting defendant Beverly Hills Savings' motion for summary adjudication as to counts 2, 3, 4, 6, 8, and 9, and denying such motion as to counts 1, 5, 7, 10, 11, 12, 13, and 14. Each party shall bear its own costs on appeal.

Campbell, P. J., and Dabney, J., concurred.