[No. B050595. Second Dist., Div. Three. Nov. 28, 1990.]

RAYMOND LEX WEBB, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
NEW WEST FEDERAL SAVINGS AND LOAN ASSOCIATION,
etc., et al., Real Parties in Interest.

**COUNSEL**

Herzfeld & Rubin and Martin S. Friedlander for Petitioner.

No appearance for Respondent.

Wyman, Bautzer, Kuchel & Silbert, Penny Kelen Meepos and Kathleen Villarruel Schneider for Real Parties in Interest.

OPINION

CROSKEY, J.—

## INTRODUCTION

Petitioner Raymond Lex Webb (Webb) seeks a writ of mandate and a review of the order of the superior court granting summary adjudication of issues in favor of real party in interest New West Federal Savings and Loan Association (New West).[1] The issues presented involve the interpretation and application of federal law, specifically *D'Oench, Duhme & Co.* v. *F.D.I.C.* (1942) 315 U.S. 447 [86 L.Ed. 956, 62 S.Ct. 676] (*D'Oench, Duhme*) and its progeny.

■ In *D'Oench, Duhme* the Federal Deposit Insurance Corporation (the FDIC) sued D'Oench, Duhme & Co., a brokerage firm, for payment on a note the FDIC assumed when the bank that held the note failed. D'Oench, Duhme & Co. executed the note so that the bank could cover a loss from bonds it had bought from the firm. The receipt for the note, not contained in the bank records, indicated that the note was given with the understanding that it would never be called for payment. (315 U.S. at p. 454 [86 L.Ed. at p. 960].) D'Oench, Duhme & Co. asserted the agreement and lack of consideration as defenses to liability. The Supreme Court held that the defendant was estopped from raising defenses based on this "secret agreement." (315 U.S. at pp. 460-461 [86 L.Ed. at pp. 963-964].) The court, after analyzing several provisions in section 12B of the Federal Reserve Act (12 U.S.C. § 264),[2] held that liability was determined by federal common law, pursuant to the federal policy to protect both the FDIC and the public funds that it administers against "misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans." (315 U.S., at pp. 456-457 and fns. 3 and 4 [86 L.Ed. at pp. 961-962].) In furtherance of that policy, a defendant is not permitted to assert as a defense an agreement that was intended to "deceive the

---

[1] Webb's petition refers to an additional real party in interest, American Savings and Loan Association (American), a California corporation. American was declared insolvent in September 1988, and its assets were transferred to a newly created entity, American Savings, a federal savings and loan association (American Savings). In December 1988, the Federal Home Loan Bank Board (the Board) appointed the Federal Savings and Loan Insurance Corporation (the FSLIC) as receiver for American Savings. On December 27, 1988, the Board authorized the formation of two new federally chartered savings and loan associations, American Savings Bank and New West. New West received the property at issue here, as well as all of the litigation of American Savings, including this lawsuit. We conclude from these facts that American is no longer in existence, and New West is the only real party in interest involved in this writ petition.

[2] Now title 12, chapter 16, entitled Federal Deposit Insurance Corporation at 12 United States Code sections 1811 et seq.

creditors or the public authority or would tend to have that effect." (*Id.*, at p. 460 [86 L.Ed. at p. 963].)

*D'Oench, Duhme* has been applied in numerous cases over the years. Its holding has become known as the *D'Oench, Duhme* doctrine, which is "essentially a rule of estoppel." (*Fair* v. *NCNB Texas Nat. Bank* (N.D.Tex. 1990) 733 F.Supp. 1099, 1103.) "It prevents those who give notes to federally insured institutions from raising defenses based on side agreements made with officers of failed institutions regarding the enforceability of promissory notes. The doctrine encourages debtors to memorialize all agreements in writing and reflects the equitable principle that losses incurred as a result of unrecorded arrangements should not fall on deposit insurers, depositors, or creditors but rather upon the person who could have best avoided the loss. [Citations.]" (*Ibid.*) As will be seen, the facts of this case bring it squarely within the *D'Oench, Duhme* doctrine. We hold that the trial court correctly applied *D'Oench, Duhme*, and we deny the writ.

## FACTS AND PROCEDURAL BACKGROUND

■ We recite the facts in light of the general rule for reviewing a summary adjudication of issues: we construe the moving party's declarations strictly and the responding party's declarations liberally. (*LaRosa* v. *Superior Court* (1981) 122 Cal.App.3d 741, 745 [176 Cal.Rptr. 224].)

### The Rubidoux Project

In late 1981 and early 1982, Frank Vaughn (Vaughn) was senior executive vice-president and director of State Savings and Loan (State). He supervised the real estate department, which was charged with monitoring construction loans that were in default, and with implementing what were called "work out" programs to cure the defaults or to acquire and dispose of State's secured properties with the least cost to State. One loan that was in default involved the construction of ten single family houses and the development of fourteen additional acres in Rubidoux, California (the Rubidoux project).

In early 1982, Vaughn contacted Webb, who was doing business as Webb Construction Company, a sole proprietorship. At Vaughn's request, Webb agreed to take over management of the Rubidoux project, to obtain a deed in lieu of foreclosure, to complete and sell the first 10 houses (Phase 1), and then to construct and sell residences on the 14 acres (Phase 2). State and Webb agreed to the terms of a joint venture under which State would pay all costs of development, Webb would be paid a percentage of costs as

overhead and a contractor's fee, and any profits would be shared equally between State and Webb.

Vaughn asked two officers who were working in State's real estate department to prepare the documents reflecting the joint venture. The only written document that was prepared, however, spelled out the equal division of profits aspect of the agreement with respect to Phase 1 only. No written document was ever prepared by State to document the joint venture agreement as to Phase 2.

Webb completed construction of and sold the first 10 houses under Phase 1 of the joint venture agreement. As a result of the sales, the entire trust deed in favor of State was paid in full, and the profits, $72,329, were to be equally divided between State and Webb. However, State did not divide or pay to Webb any of the profits and, by December 31, 1982, State owed Webb just over $36,000. In August 1983 State merged with American.

*The Woodrow Wilson Deed of Trust*

Webb and his wife, Barbara Young Webb, owned a home at 7692 Woodrow Wilson Drive (the Woodrow Wilson property) in Los Angeles, which was their principal residence. In March 1983 Webb borrowed $450,000 from State and secured it by a first trust deed on the Woodrow Wilson property. The terms of the loan provided that the first 11 months' interest would be paid from an interest reserve account. Webb told Vaughn that he planned to repay the loan with his proceeds of the joint venture.

*The Litigation*

On July 11, 1984, State, which by then had merged with and was known as American, (see fn. 1, *ante*), recorded a notice of default on the trust deed on the Woodrow Wilson property. In August 1984 the management of American was replaced, and the new management decided to close down several development projects, including Phase 2 of the Rubidoux project.

In October 1984, American began foreclosure proceedings against the Woodrow Wilson property. In March 1985, Webb filed bankruptcy, and the foreclosure sale was automatically stayed.

In an effort to save his home and recover what was due him under the joint venture, Webb, in February 1986, filed suit against American. In July 1986, he filed an amended complaint in which he alleged multiple causes of action and sought a temporary restraining order to enjoin the trustee's sale, which was then proceeding. Webb was unsuccessful in his attempt to block

the sale, which took place on August 25, 1986. Subsequently, American, in an effort to enforce its trustee's deed and gain possession, filed an unlawful detainer action against Webb, who still resided with his wife at the Woodrow Wilson property. On September 2, 1988, American filed a motion for summary judgment or summary adjudication of issues. That motion was denied, except as to four issues, on the ground that there were questions of fact concerning Webb's claimed set-off defense.

During the next several months, American was declared insolvent and eventually the deed of trust on the Woodrow Wilson property and the litigation surrounding it were transferred to New West. (See fn. 1, *ante.*) On August 29, 1989, New West filed a complaint as defendant in intervention in the Webb suit. On that same date, New West filed a motion for summary judgment or summary adjudication of issues.

Following many subsequent filings, the trial court denied the summary judgment but granted the summary adjudication on multiple issues. The court ruled that (1) the *D'Oench, Duhme* doctrine estopped Webb's claims for affirmative relief or a setoff of money allegedly owed him, and (2) New West did not waive that defense in the unlawful detainer action.[3] The trial court also found that insofar as Webb's multiple causes of action for damages were based on the oral agreement and related to Phase 2 of the Rubidoux project, those causes of action are barred.[4] The trial court found that Webb is barred from (1) claiming damages or rescission based on the Truth-in-Lending Act, and (2) from recovering punitive damages.[5]

PETITIONER'S CONTENTIONS

Webb makes a number of contentions which we summarize as follows: (1) the *D'Oench, Duhme* doctrine does not preempt the California equitable doctrines of set-off and successor liability, nor does it bar the assertion of those claims in this case; (2) even if the *D'Oench, Duhme* doctrine does apply, it may not be asserted by New West; (3) the codification of the *D'Oench, Duhme* doctrine, 12 United States Code section 1823, does not apply in this case; (4) New West waived its right to assert the *D'Oench,*

---

[3] The trial court ruled in addition that Webb is barred from (1) claiming excuse from performance on the $450,000 note based upon offset of future profits from the alleged oral joint venture, or based on the offset of profits on Phase 1; and (2) claiming profits from the alleged oral joint venture.

[4] The court ruled that the following causes of action were adjudicated in favor of New West with respect to Phase 2 and the oral agreement: (1) breach of joint venture agreement, (2) breach of the implied covenant of good faith and fair dealing, (3) bad faith denial of contract, (4) breach of trust, (5) rescission.

[5] The trial court thus effectively adjudicated Webb's injunction, reformation and specific performance causes of action in favor of New West.

*Duhme* doctrine and is estopped from asserting it; and (5) the doctrine does not bar any of Webb's causes of action for damages, rescission or punitive damages.

### DISCUSSION

#### 1. *Standard of Review*

■ Review of the trial court's determination on a motion for summary adjudication of issues involves pure matters of law. First, the appellate court must analyze the pleadings to determine whether the motion is directed to the issues raised by the pleadings. Then, the court examines the showing made by the moving party. Where the moving party is a defendant, the moving papers must establish a complete defense or negate a necessary element of the plaintiff's case. If such a showing is made, the court examines the showing of the opposing party to determine whether it created any triable issue of fact material to the moving party's showing. (*Laible* v. *Superior Court* (1984) 157 Cal.App.3d 44, 46 [203 Cal.Rptr. 513]; *LaRosa* v. *Superior Court, supra*, 122 Cal.App.3d at pp. 744-745.)

#### 2. *Webb Is Estopped by the D'Oench, Duhme Doctrine*

##### a. *The Doctrine Prevails Over State Law Doctrines*

Webb contends that the *D'Oench, Duhme* doctrine does not preempt California's equitable doctrines of setoff (*Hauger* v. *Gates* (1954) 42 Cal.2d 752 [269 P.2d 609]) and successor liability (*Ray* v. *Alad Corp.* (1977) 19 Cal.3d 22 [136 Cal.Rptr. 574, 560 P.2d 3]). He argues that the supremacy clause of the federal Constitution[6] requires congressional action in order to give the clause such effect. He contends that because the *D'Oench, Duhme* doctrine was created by the Supreme Court and not by Congress, the supremacy clause has no effect in this case. He concludes, therefore, that a California court should ignore *D'Oench, Duhme* and apply state law only.

In *Fidelity Federal Sav. & Loan Assn.* v. *De La Cuesta* (1982) 458 U.S. 141 [73 L.Ed.2d 664, 102 S.Ct. 3014], the United States Supreme Court decided a preemption issue involving conflicting state and federal regulations of savings and loans. The regulations promulgated by the Board explicitly permitted "due-on-sale" clauses; our state Supreme Court had

---

[6] "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." (U.S. Const., art. VI, cl. 2.)

found due-on-sale clauses to be unreasonable restraints on alienation in *Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943 [148 Cal.Rptr. 379, 582 P.2d 970]. ▆ In reaching its holding that the state rule was preempted, the Supreme Court reviewed the law of preemption, including the proposition that "[e]ven where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when 'compliance with both federal and state regulations is a physical impossibility' [citation], or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress [citations].'" (458 U.S. at p. 153 [73 L.Ed.2d at p. 675]. See also, *English* v. *General Electric Co.* (1990) 495 U.S. __, __ [110 L.Ed.2d 65, 74, 110 S.Ct. 2270, 2275] and cases cited there; *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 936-938 [216 Cal.Rptr. 345, 702 P.2d 503].)

Preemption does not begin and end with a statute or a regulation, however. As the California Supreme Court in *Farmland Irrigation Co.* v. *Dopplmaier* (1957) 48 Cal.2d 208, 219 [308 P.2d 732, 66 A.L.R.2d 590], stated: "If the policy of [a] federal statute requires it, state law must of course give way. [Citations.] Moreover, the absence of any specific statutory provision governing the issue does not in itself mean that federal law does not control, for if the policy of the federal statute or the implications of the federal system require a uniform rule of decision, the federal courts have paramount power to fashion such a rule." (*Ibid.*, citing *D'Oench, Duhme, supra,* 315 U.S. at pp. 456-458 [86 L.Ed. at pp. 961-963].)

▆ The *D'Oench, Duhme* doctrine is a rule of law created by the United States Supreme Court interpreting a statute enacted by the United States Congress for the purpose of regulating the banking industry. The doctrine is rooted in a federal policy of protection both of the regulator and of the depositors. (*D'Oench, Duhme, supra,* 315 U.S. at p. 457 [86 L.Ed. at p. 962].) The rationale of *D'Oench, Duhme* "has been uniformly extended to the [FSLIC] and the savings and loan industry . . . ." (*Federal Sav. and Loan Ins. Corp.* v. *Locke* (W.D.Tex. 1989) 718 F.Supp. 573, 582, and cases cited there.) "Numerous courts" have held that for purposes of applying the *D'Oench, Duhme* rule, "no distinction should be drawn between the FDIC and the FSLIC." (*Federal Sav. and Loan Ins. Corp.* v. *Musacchio* (N.D.Cal. 1988) 695 F.Supp. 1044, 1051, and cases cited there.) In addition, the "policy supporting protection of the FSLIC and FDIC in collateral agreement situations applies equally to all situations in which the maker's defense is based on representations or conduct outside of the note itself." (*Federal Sav. and Loan Ins. Corp.* v. *Locke, supra,* 718 F.Supp. at p. 582.)

### b. *The Doctrine Is Applicable to the Facts of This Case*

Given the facts of this case, there is no question that the *D'Oench, Duhme* doctrine applies. It is equally clear that failing to apply it would create an obstacle to the accomplishment of federal policy. The case law establishes a clear and consistent federal policy which, under *De La Cuesta, supra*, 458 U.S. 141 and *Dopplmaier, supra*, 48 Cal.2d 208, we are bound to follow. To rule otherwise is to invite forum shopping by creative lawyers representing holders of notes who have oral agreements with officers of savings and loan institutions who could not assert the agreements in federal court but could in California. This could have a negative impact on the courts of this state and would damage the uniform policy that "the federal courts have the paramount power to fashion." (*Dopplmaier, supra*, 48 Cal.2d at p. 219.) We therefore hold that the *D'Oench, Duhme* doctrine is the controlling law.

Webb argues, alternatively, that even if *D'Oench, Duhme* preempts the California doctrines of set-off and successor liability, it would not "on its merits" bar his claims against New West. He contends that this case, like *Federal Deposit Insurance Corp.* v. *Meo* (9th Cir.1974) 505 F.2d 790, is different from *D'Oench, Duhme*, and due to that distinction we are not bound to apply it here.

In *Meo*, the borrower signed a note in favor of a bank to finance the purchase of shares of stock from that bank. Unbeknown to the borrower, the bank, instead of issuing stock certificates, issued voting trust certificates and held them as security for the loan. Borrower's note remained an asset of the bank until it was closed for insolvency. The Court of Appeals held that *D'Oench, Duhme* did not estop the borrower from avoiding the note for failure of consideration because the borrower was "bona fide" and was "neither a party to any deceptive scheme involving, *nor negligent* with respect to, circumstances giving rise to the claimed defense to his note . . . ." (505 F.2d at p. 793. Italics added.)

Webb has made no showing that he was deceived by State or Vaughn, nor has he shown that he was not negligent in failing (1) to notice that agreement he made with the bank regarding Phase 2 was not in writing or (2) to take steps to insure that his agreement was promptly and adequately documented. His argument that State was negligent may well be accurate, but it does not protect him from his own negligence. We find that *Meo* is factually distinguishable and does not prevent a full application of the *D'Oench, Duhme* doctrine to bar Webb's theories of liability against New West.

### c. *New West May Assert the Doctrine*

Webb contends that because the FSLIC never acquired title to the Woodrow Wilson property, it was never the successor in interest of American. He

further argues that because New West, the successor in interest of the FSLIC, received no title from the FSLIC it cannot, as a matter of law, assert the *D'Oench, Duhme* defense.

Banking regulators have two options when faced with a failing institution. They can either liquidate the institution and pay the depositors their insured amounts rather than the full amounts of their deposits; or they can arrange a purchase and assumption transaction, under which another institution buys the failed one and reopens. (*Federal Sav. and Loan Ins. Corp.* v. *Murray* (5th Cir. 1988) 853 F.2d 1251, 1256; *Federal Deposit Ins. Corp.* v. *Wood* (6th Cir. 1985) 758 F.2d 156, 160-161.) "Purchase and assumption agreements are preferred because they minimize the corporations' losses, expand the purchasing institutions' opportunities at low risk, and protect depositors." (*Porras* v. *Petroplex Sav. Ass'n* (5th Cir. 1990) 903 F.2d 379, 381.) ▇ Both the FDIC and the FSLIC are deemed holders-in-due-course when, in their corporate capacities, they purchase notes from a failing institution in a purchase and assumption agreement. (*Murray, supra,* 853 F.2d at pp. 1256-1257; *Wood, supra,* 758 F.2d at p. 160.) ▇ Providing the FSLIC with the holder-in-due-course status "promotes the necessary uniformity of law in this area while it counters individual state laws that would frustrate a basic FSLIC objective: promoting confidence and stability in financial institutions." (*Murray, supra,* 853 F.2d at p. 1256.)

Assignees of the FDIC and the FSLIC enjoy the *D'Oench, Duhme* protection from claims or defenses based on unrecorded side agreements. (*Bell & Murphy & Assoc.* v. *Interfirst Bank Gateway* (5th Cir. 1990) 894 F.2d 750, 754-755, cert. den. __ U.S. __ [112 L.Ed.2d 203, 111 S.Ct. 244]; *Porras* v. *Petroplex Sav. Assn., supra,* 903 F.2d at p. 381.) Moreover, failure to extend *D'Oench, Duhme*'s protection to "bridge banks," institutions authorized by the FDIC and the FSLIC to operate failed banks and savings and loans, "would undermine the effectiveness of bridge banks as a means of continuing the normal banking operations, and thereby protecting the depositors and creditors, of a failed [institution]." (*Bell & Murphy & Assoc., supra,* 894 F.2d at p. 754.) Purchasers "would be discouraged from acquiring assets from the FSLIC in the future, and the FSLIC would find it more difficult to protect the assets of failed institutions." (*Porras, supra,* 903 F.2d at p. 381.) Therefore, for reasons cited earlier, we follow the federal law and find that New West is entitled to assert the estoppel doctrine of *D'Oench, Duhme* against Webb.

 d. *Codification Did Not Diminish or Limit the Impact of the Doctrine*

Webb contends that 12 United States Code section 1823, which codified the *D'Oench, Duhme* doctrine, does not apply to this case because, by its

terms, it applies to the FDIC only. We agree. Webb is estopped by the doctrine as stated by the United States Supreme Court, he is not estopped by the statute.

■ Moreover, as we noted earlier, the case law is replete with opinions holding that "for purposes of applying the *D'Oench* rule no distinction should be drawn between the FDIC and the FSLIC. [Citations.] As far as can be determined, no courts have held that *D'Oench* ought not to apply to FSLIC simply because 12 U.S.C. § 1823(e) only refers to the FDIC. There is thus no question that *D'Oench* estops [the party opposing the summary judgment] . . . ." (*Federal Sav. & Loan Ins. Corp. v. Musacchio, supra*, 695 F.Supp. at p. 1051. See also, *e.g., Carteret Sav. Bank, P.A. v. Compton, Luther & Sons* (4th Cir. 1990) 899 F.2d 340, 343-344 ["[T]here is no material difference between the FDIC and the FSLIC as far as the public policy behind *D'Oench* and its progeny is concerned."]; *Federal Sav. and Loan Ins. Corp. v. LeFeve* (S.D.Miss. 1987) 676 F.Supp. 764, 768; *Federal Savings and Loan Ins. Corp. v. Hsi* (E.D.La. 1986) 657 F.Supp. 1333, 1338.) This argument provides no aid to Webb in his effort to have the trial court's ruling reversed.

### e. *Conclusion*

We therefore find that Webb is estopped by the *D'Oench, Duhme* doctrine from asserting the oral agreement which was allegedly made with State and Vaughn.[7]

### 3. *American Did Not Waive D'Oench, Duhme, Nor Is It Estopped from Asserting the Doctrine*

### a. *No Waiver*

■ Citing *California Concrete Co. v. Beverly Hills Savings & Loan Assn.* (1989) 215 Cal.App.3d 260 [261 Cal.Rptr. 484], Webb argues that American waived the right to assert *D'Oench, Duhme* because it failed to raise it in the unlawful detainer action in 1988. He argues: American, which was then the successor to State, filed for summary judgment in the unlawful detainer action on September 2, 1988. American also sought to strike Webb's affirmative defenses. On September 15, Webb opposed on the ground that American had no standing because the Board had appointed the FSLIC as receiver for American, and the FSLIC transferred American's assets to

---

[7] As a result of this conclusion we need not separately discuss the issues of (1) the application of the equitable doctrines of set-off and successor liability; (2) the availability of tort claims against New West; (3) the availability of rescission as a remedy against New West; or (4) the availability of punitive damages as they relate to the Phase 2 oral agreement.

American Savings on September 6, 1988. In its reply to the opposition, American Savings did not assert that Webb was estopped from asserting his affirmative defenses, pursuant to *D'Oench, Duhme*. Therefore, Webb argues, New West should not be allowed to raise *D'Oench, Duhme* now, under *California Concrete*.

In *California Concrete* the court held that a savings and loan could not, for the first time in the two-year old law suit, assert *D'Oench, Duhme* in response to a summary judgment motion. The court held that by failing to raise the *D'Oench, Duhme* defense in its answer and giving plaintiff "some time to investigate the facts and law related to the defense," the savings and loan waived the defense. (215 Cal.App.3d at p. 273.)

*California Concrete* does not require a finding of waiver here. To begin with, in this case, the entity which is the defendant is New West. New West was not a party to the unlawful detainer proceeding. When New West became a party to this action, by filing a complaint as a defendant in intervention, it contemporaneously filed the present motion for summary judgment or summary adjudication. Because New West did assert the defense of *D'Oench, Duhme* "at the earliest possible time," no waiver of the defense could result. (*California Concrete, supra*, 215 Cal.App.3d at p. 272.) Moreover, the tone of the opinion in *California Concrete* implies that the court based its ruling in part on its finding that the savings and loan had tried to mislead the plaintiff by not timely raising the defense. There is no factual basis for such a finding in this case.

In addition, in this case the Board appointed the FSLIC and created a new savings and loan in the same month, indeed, within a matter of weeks before the summary judgment motion was heard in the unlawful detainer matter. That did not give American and its lawyers much time to research the new law that governed the case. Therefore, even if we were to find that New West as the defendant in the present action were bound by the actions of American as the plaintiff in the unlawful detainer action, an issue we do not reach, we would not find ourselves compelled to find that American had waived the *D'Oench, Duhme* defense. (See *California Concrete Co.* v. *Beverly Hills Savings & Loan Assn., supra*, 215 Cal.App.3d at pp. 272-272, and cases cited there.) Thus, there is no basis for finding that American waived the defense.

b. *No Estoppel*

 Webb contends that New West is estopped from raising *D'Oench, Duhme* by State's negligent failure to document the Phase 2 aspect of the Rubidoux Project agreement. He argues that the defense "appears to bar

secret oral agreements." Therefore, he maintains it should not bar the oral agreement he made with Vaughn, because it was not secret, and Webb intended that it be in writing. Since it was not memorialized in a written document due to the negligence of State and through no fault of his, he argues, he should not be the party who suffers the burden of *D'Oench, Duhme.*

We sympathize with Webb. The *D'Oench, Duhme* doctrine is quite harsh and in this case, where he as the borrower has made a prima facie showing that he was not at fault, the severity of the rule is heightened. Nevertheless, we have no choice but to apply it. As stated earlier, it established a federal policy that has lasted for nearly 50 years, and it has withstood arguments similar to the one Webb makes here. (*E.g, D'Oench, Duhme, supra,* 315 U.S. at p. 458-459 [86 L.Ed. at p. 963], quoting *Rinaldi* v. *Young* (D.C. Cir. 1937) 92 F.2d 229, 231 [even a borrower " 'very ignorant and ill-informed of the character of the transaction' " who did not intend to deceive would be estopped from asserting an oral side agreement]; *Beighley* v. *Federal Deposit Ins. Corp.* (5th Cir. 1989) 868 F.2d 776, 784.) As stated by the court in *Bell & Murphy & Assoc.* v. *Interfirst Bank Gateway, supra,* 894 F.2d at p. 754, "[The borrower] could have protected itself by insisting that the bank properly record the agreement; because it did not, it is estopped from asserting any claims arising out of the bank's alleged secret promise . . . ." Webb, an experienced contractor, should have insisted that his Phase 2 agreement be completely and correctly documented. He failed to do this, and he will not now be permitted to impose upon New West the burden of his failure to engage in responsible and customary business practices.

## CONCLUSION

The alternative writ is discharged. The peremptory writ of mandate is denied.

Klein, P. J., and Hinz, J., concurred.

Petitioner's application for review by the Supreme Court was denied February 28, 1991.