**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**R & H COAL COMPANY, INCORPORATED, Respondent.**

No. 92–1934.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 3, 1993.

Decided April 19, 1993.

---

Christopher Warren Young, N.L.R.B., Washington, DC, argued (Jerry M. Hunter, General Counsel, Yvonne T. Dixon, Acting Deputy Gen. Counsel, Nicholas E. Karatinos, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Linda Dreeben, Supervisory Atty., N.L.R.B., on brief), for petitioner.

Niall Anthony Paul, Spilman, Thomas, Battle & Kloster–Meyer, Charleston, WV, argued (Charles L. Woody, on brief), for respondent.

Before RUSSELL and WILKINSON, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

## OPINION

WILKINSON, Circuit Judge:

R & H Coal Company, Inc. was found to have violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act by unilaterally reducing the wages of its miners. The National Labor Relations Board ordered R & H to give its miners backpay for the period during which R & H had lowered their wages. R & H sought to offset the backpay award with certain production incentive bonuses that R & H had paid to its miners during the backpay period. The NLRB ruled that these bonuses did not count as wages, and thus that R & H was not entitled to the offset. We find that substantial evidence supports this ruling, and accordingly enforce the order of the NLRB.

### I.

R & H Coal Company, Inc. has operated a coal mine near Jewell Valley, Virginia on an on-again, off-again basis since 1979. In August 1987, R & H decided to reopen the mine and a month later became a signatory to the National Bituminous Coal Wage Agreement of 1984. On November 16, 1987, the United Mine Workers of America (the "Union") notified R & H that it would terminate the NBCWA, as allowed by the Agreement, on January 31, 1988. R & H informed the Union that it would negotiate separately for a new labor contract, but those negotiations apparently were unsuccessful. In late November, R & H again shut the coal mine down.

On or about March 7, 1988, R & H reopened the mine. Although the NBCWA had expired, R & H was required to compensate its miners under the terms of the NBCWA until it reached a new collective bargaining agreement with the Union. *See NLRB v. Cauthorne*, 691 F.2d 1023, 1025 (D.C.Cir.1982); *NLRB v. Carilli*, 648 F.2d 1206, 1214 (9th Cir.1981). Instead, however, R & H reduced the wages of its miners from $14.49–$15.56 per hour to $11.50–$12.00 per hour. The Union accordingly filed a complaint with the National Labor Relations Board. On July 11, 1989, in an unreported decision, the Board ruled that these unilateral changes in the terms of employment vio-

lated §§ 8(a)(1) and 8(a)(5) of the NLRA, 29 U.S.C. §§ 158(a)(1), 158(a)(5). The Board ordered R & H to give its employees backpay, plus interest, for the wages they had lost. We enforced the order of the Board. No. 89–1599 (Jan. 30, 1990).

A dispute then arose over whether certain production incentive bonuses counted as wages for purposes of the backpay award. In October 1988, R & H had begun paying its miners a bi-monthly bonus for the coal they mined in excess of "normal production" during the previous half month. R & H had targeted "normal production" as 600 tons of coal per day, and had paid each of its miners $0.15 per ton that the entire mine produced daily in excess of that amount. R & H maintained that these bonuses were wages, and that R & H was thus entitled to offset the backpay that the NLRB had ordered R & H to disburse to its miners. On March 12, 1992, the NLRB issued a supplemental order rejecting R & H's offset claim. On August 13, 1992, the Board applied to this court for enforcement of the supplemental order. R & H opposed the application.

## II.

■ We shall review at the outset the relevant legal principles with respect to the treatment of production incentive bonuses in the calculation of backpay awards. The basic rule is that payments for the routine, everyday work of employees are wages, and thus may be offset from backpay awards, whereas payments for the additional efforts of employees are bonuses, and may not. The critical factor is not the label affixed to the payment, but its operative effect. This rule is most fully explicated in *K. & H. Specialties Co.,* 163 N.L.R.B. 644 (1967) ("*K & H*").

In *K & H,* the NLRB ordered the employer K & H Specialties, a provider of duplicating services, to give backpay to those employees who had lost wages during the period that K & H had refused to execute their collective bargaining agreement. 163 N.L.R.B. at 645. One of these employees, a Xerox operator, had been paid $1.85 per hour plus a $25 monthly bonus during the first ten months of the backpay period, and $2.00 per hour but no monthly bonus during the last

two months. The additional $0.15 per hour during the last two months amounted to $6 per week on a normal 40–hour work week— almost exactly the $25 per month that the employee had gotten from her monthly bonus during the first ten months. *Id.* at 648. The president of the K & H testified that he had given the employee this bonus "because she kept a record of her production on the Xerox camera, and he regarded it as extra work for which she should be separately compensated." *Id.*

The General Counsel for the NLRB relied on the president's statement to argue that the $25 monthly bonus was not a wage, since the employee had received it for work beyond her normal duties. The Board disagreed. In the Board's view, the Xerox camera record that the employee kept was part of the "normal performance of regularly assigned duties." *K & H,* 163 N.L.R.B. at 648. Thus the monthly bonuses "were an integral part of [the employee's] monetary wage package which [she] had a right to expect would continue to be paid until [her] total wages were otherwise adjusted." *Id.* To substantiate this finding, the Board observed that "when the monthly bonuses ... were discontinued, an equivalent amount was incorporated into [her] hourly rates, while [her] job duties remained unchanged. Only the method of compensation was modified, from a combination of hourly rate and monthly bonus to a straight hourly rate." *Id.* The Board therefore offset the backpay that K & H owed this employee by the amount of the $25 monthly bonuses.

## III.

R & H contends that, like the bonuses in *K & H,* its production incentive bonuses were the equivalent of wages. R & H emphasizes that its bonuses were (1) fixed—at $0.15 per ton of coal; (2) obligatory—the miners had a right to expect the bonus; and (3) regular— paid every half month. R & H notes that the miners did not have to work overtime or do different kinds of work to earn their bonus; the bonus was for their ordinary day-time work of mining coal. Finally, R & H observes that it paid the bonus across the board to all miners, regardless of how much

coal they mined individually during the preceding half month, and never withheld the bonus to discipline an individual worker. R & H thus maintains that its bonuses were for the "normal performance of regularly assigned duties," not for the exceptional efforts of individual miners, and that the NLRB should have offset the backpay award by the amount of these bonuses.[1]

■ We disagree. R & H's argument ignores the posture that this court must assume in reviewing the findings of the NLRB. R & H is correct that *K & H* drew an abstract line between "payments given for the routine day-to-day performance of work," which were wages, and "unexpected, gratuitous rewards ... for extraordinary efforts," which were not. 163 N.L.R.B. at 649. Where this line is drawn in the particular case, however, turns on the baseline question of what was "the routine day-to-day performance of work"—a factual determination on which we must defer to the NLRB. "The Board enjoys discretion in framing appropriate back pay remedies, and to the extent that the Board's decision rests on findings of fact for which there is 'substantial evidence' in the record as a whole, this court must defer to that decision." *Lundy Packing Co. v. NLRB*, 856 F.2d 627, 629 (4th Cir.1988) (citations omitted).

■ In this case, we find that substantial evidence supports the decision of the NLRB. First of all, the bonuses were not in a strict sense fixed. The formula for calculating the bonus was fixed—$0.15 per ton of coal above 600 tons per day—but the actual amount of the bonus varied in direct proportion to the additional efforts of the miners. Nor were the bonuses in a strict sense regular. Even though R & H paid the bonus every half month, that payment was contingent upon the miners producing coal in excess of 600 tons per day.

Finally, contrary to what R & H maintains, the miners' responsibilities did change after R & H instituted the bonus plan in October 1988. When R & H instituted the bonus

plan, the average wage (including the bonus) rose to $15.25–$15.75 per hour. The bonus thus brought the miners' earnings to the NBCWA wage ($14.49–$15.56 per hour), except that now the miners had to produce more coal than R & H's definition of "normal production": 600 tons per day. In other words, the miners' responsibilities had not changed in kind, but they had changed in degree. In *K & H*, by contrast, when the employee received the wage hike that compensated for her lost bonus, the Board found that her "job duties remained unchanged"; she still had only to keep the production record on her Xerox camera. 163 N.L.R.B. at 648.

### IV.

In short, we see ample evidence to support the Board's finding that the production incentive bonuses were given for the "extraordinary efforts" of R & H's employees. R & H nonetheless insists that without the increased coal production from the bonus plan, it could not have stayed in business, let alone paid its miners union scale. R & H asks how it is that employee efforts which were minimally necessary to turn a profit could ever be considered "extraordinary," and accuses the NLRB of giving the miners a double recovery.

■ R & H's objection is misplaced. At root, it is a complaint about the terms of the National Bituminous Coal Wage Agreement of 1984. Essentially, the NLRB found that the NBCWA wage of $14.49–$15.56 per hour was predicated on the R & H miners producing 600 tons of coal per day. If these terms made it impossible for R & H to operate its mine, R & H should have negotiated a new labor agreement when the old one had expired. Instead, however, R & H reduced its miners' wages and then compensated by offering a bonus plan, whose effect was to require the miners to produce more than 600 tons per day in order to earn their negotiated wages. In so doing, R & H unilaterally

---

1. R & H also challenges the NLRB's inclusion of interest in the backpay award. This challenge is not timely. In the original NLRB order that we enforced, R & H was required to "make all employees whole, with interest," for their lost wages. R & H should have taken issue with the award of interest then.

changed the terms of the collective bargaining agreement, and violated the NLRA.[2]

For the foregoing reasons, the order of the NLRB is

ENFORCED.

---

**2.** For analogous reasons, we decline R & H's invitation to follow certain precedent holding that bonuses are wages for purposes of calculating overtime backpay awards under the Fair Labor Standards Act. *See, e.g., Walling v. Harnischfeger Corp.,* 325 U.S. 427, 65 S.Ct. 1246, 89 L.Ed. 1711 (1945); *McLaughlin v. McGee Bros. Co.,* 681 F.Supp. 1117, 1133–34 (W.D.N.C.1988). FLSA precedent is inapposite to the inquiry at hand. The purpose of the FLSA is to guarantee a minimum level of compensation to workers, regardless of the outcome of the bargaining process. *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 739–41, 101 S.Ct. 1437, 1444–45, 67 L.Ed.2d 641 (1981). The purpose of the NLRA, by contrast, is to facilitate the collective bargaining process, and ensure that its outcome is enforced. Unlike the FLSA, therefore, NLRA backpay awards turn on how the labor agreement is interpreted: What was the negotiated wage? How much coal did the miners have to produce to earn that wage? And unlike the FLSA, we are constrained to defer to the NLRB's resolution of these questions.