[No. A078491. First Dist., Div. Five. Sept. 8. 1998.]

MECHANICAL CONTRACTORS ASSOCIATION OF NORTHERN CALIFORNIA, Plaintiff and Appellant, v.
GREATER BAY AREA ASSOCIATION OF PLUMBING AND MECHANICAL CONTRACTORS, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

*\*Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for publication, with the exception of parts III and IV.*

674

## COUNSEL

Carter & Carter, James A. Carter and Michelle Q. Carter for Plaintiff and Appellant.

Littler Mendelson, Daniel A. Croley and Salime Samii for Defendant and Respondent.

## Opinion

**JONES, Acting P. J.**—This is an action for breach of contract and declaratory relief brought by appellant Mechanical Contractors Association of Northern California (hereafter MCA) against respondent Greater Bay Area Association of Plumbing and Mechanical Contractors (hereafter GBA). Both parties are associations of licensed mechanical and plumbing contractors which act as collective bargaining agents on behalf of their members. At the outset of the trial below, the trial court granted GBA's motion *in limine* to exclude all of MCA's evidence, in effect granting a nonsuit for GBA. In accordance with the parties' stipulation, the trial court thereafter entered judgment in favor of GBA and against MCA.

The ultimate issue on appeal is whether a contract based on a January 1994 letter between the parties is invalid or void as a matter of law. GBA contends the contract is invalid as a matter of law because it purports to modify certain collective bargaining agreements (hereafter Agreements) between MCA, GBA, and two labor unions, but without the unions' written consent thereto, as required by the Agreements. GBA also contends the contract is void because MCA failed to comply with federal statutory notice requirements for modifications to collective bargaining agreements. Finally, GBA contends that even if the contract was initially valid, it was superseded when the Agreements subsequently were extended without incorporating the contract therein. MCA opposes all these contentions on their merits.

We conclude that the contract between MCA and GBA is not invalid or void as a matter of law for the reasons asserted by GBA, and that the trial court therefore erred by granting GBA's motion *in limine*. We reverse the trial court's judgment and remand this matter to the trial court for further proceedings.

### Standard of Review

In reviewing the propriety of the order granting GBA's motion *in limine*, we will apply the standard of review applicable to an order granting a nonsuit.

As was well stated recently by Division Three of this court: "In contrast to the usual motion *in limine*, which seeks to keep particular items of evidence from a jury, an 'objection to all evidence' is essentially the same

as a general demurrer or motion for judgment on the pleadings seeking to end the trial without the introduction of evidence. Such an objection is properly sustained where even if the plaintiff's allegations were proven, they would not establish a cause of action. [Citations.]" (*Edwards* v. *Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 26 [61 Cal.Rptr.2d 518] (*Edwards*).) Where, as here, the trial court grants a motion at the beginning of trial to exclude all evidence produced during discovery, the motion "may [also] be viewed as the functional equivalent of an order sustaining a demurrer to the evidence, or nonsuit." (*Id.* at p. 27.)

"In either case, the scope of the trial court's inquiry was relatively narrow. Both a demurrer and a motion for judgment on the pleadings accept as true all material factual allegations of the challenged pleading, unless contrary to law or to facts of which a court may take judicial notice. The sole issue is whether the complaint, as it stands, states a cause of action as a matter of law. [Citations.] The scope of a trial court's inquiry on a motion for nonsuit is similarly limited. A motion for nonsuit or demurrer to the evidence concedes the truth of the facts proved, but denies as a matter of law that they sustain the plaintiff's case. A trial court may grant a nonsuit only when, disregarding conflicting evidence, viewing the record in the light most favorable to the plaintiff and indulging in every legitimate inference which may be drawn from the evidence, it determines there is *no* substantial evidence to support a judgment in the plaintiff's favor. [Citations.]" (*Edwards, supra,* 53 Cal.App.4th at pp. 27-28, italics in original.)

In *Edwards,* the court concluded on the record there presented that the trial court's grant of the respondent's motions *in limine* "was tantamount to a nonsuit." (*Edwards, supra,* 53 Cal.App.4th at p. 28.) Since the record in this case supports the same conclusion, we shall treat the trial court's order granting GBA's motion *in limine* to exclude all evidence as a nonsuit. "Therefore, on this appeal we must view the evidence most favorably to [MCA], resolving all presumptions, inferences and doubts in [its] favor, and uphold the judgment for [GBA] only if it was required as a matter of law." (*Ibid.*)

We reject GBA's assertion that we must imply factual findings in favor of the trial court's judgment because MCA did not request a statement of decision pursuant to Code of Civil Procedure section 632. As MCA argues, the express language of section 632 requires a trial court to issue a statement of decision only after a "trial of a question of fact by the court." No such trial occurred in this case. Rather, the trial court only granted GBA's motion

*in limine* to exclude all evidence. ■ The general rule is that a trial court need not issue a statement of decision after a ruling on a motion. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1294 [240 Cal.Rptr. 872, 743 P.2d 932].) In fact, in ruling on GBA's motion, the trial court was bound to view all factual allegations in the light most favorable to MCA. (*Edwards, supra,* 53 Cal.App.4th at p. 27.) We must not only do the same, but must also resolve all presumptions, inferences, and doubts in MCA's favor. (*Id.* at pp. 27-28.)

### FACTUAL BACKGROUND

MCA and GBA are associations of mechanical and plumbing contractors. Each negotiates and enters into collective bargaining agreements with labor unions on behalf of its member contractors. As multi-employer associations, MCA and GBA are parties to separate collective bargaining agreements with the labor unions whose members work for the contractors. Pertinent to this appeal, these collective bargaining agreements generally provide for the payment of "contract administration and industry funds" (hereafter Funds) by association members to their respective associations.[1]

In 1993, MCA and GBA had several disputes over whether individual members could switch their membership from one association to another while a particular collective bargaining agreement was still in effect. At issue was how to allocate Funds to the associations when a switch occurred. The parties met in December 1993 in an effort to resolve their differences, at which time Scott Strawbridge, then executive vice-president of MCA, informed GBA that MCA would shortly be presenting a written proposal for GBA's consideration.

On January 7, 1994, Strawbridge sent a letter outlining MCA's proposal to Ron Peterson, then president of GBA. Among other things, MCA proposed that the parties agree that an individual member could switch associations simply by giving written notice to both associations and that Funds earned after the effective date of the switch would be paid to the member's new association. Strawbridge included with his letter a check for $5,000 as payment in exchange for GBA's assignment to MCA of GBA's right to

---

[1]These Funds are defined as "monies earned by the respective associations for all work performed by union members under the collective bargaining agreements to which that association is signatory."

collect that sum from another organization known as "CPMCA."[2] Straw-bridge stated that if GBA found the proposal acceptable, then Peterson should obtain authority from GBA's board of directors to initial the letter to signify GBA's acceptance, at which time GBA could cash the check. If GBA found the proposal unacceptable, then GBA was to return the check to MCA.

Prior to making this proposal to GBA, Strawbridge had contacted the business managers of the two unions whose Agreements would be affected if MCA and GBA agreed on the proposal, U.A. Local 467 and U.A. Local 393. Strawbridge contacted the unions because he knew that modification of any provision in the Agreements required the consent of the unions who were signatory to those Agreements. The unions indicated they would comply with whatever procedure MCA and GBA developed with respect to allowing their members to switch associations. Neither union gave its consent in writing, however.

At a meeting on January 11, 1994, GBA's board of directors agreed to accept MCA's $5,000 check. The minutes of the meeting stated in conjunction with that action that "[i]f anyone wishes to change associations they can change on the anniversary date of each year." On January 20, 1994, Peterson initialed Strawbridge's January 7 letter and returned it to MCA. GBA also sent MCA a separate letter confirming its acceptance of the $5,000 check, and thereafter cashed the check and deposited it in its bank account.

In reliance on the MCA-GBA contract (hereafter the Contract), MCA took such steps as transferring certain Funds to GBA when GBA claimed to have provided services for a contractor that had switched its membership to MCA, and allowing one of its members to switch to GBA. MCA would not have allowed the switch but for the Contract.

The trouble in this case began in 1995 when two members of GBA attempted to switch their affiliation to MCA. GBA refused to recognize the switch on the grounds the Contract was not binding and GBA had not agreed to the switch. Funds that would have been paid to MCA for these members continue to be paid to GBA.

---

[2]CPMCA is the California Plumbing and Mechanical Contractors Association. Both MCA and GBA had joined CPMCA prior to their 1993 disputes. CPMCA members were required to contribute $5,000 as "seed money" upon joining the organization. GBA had contributed its share of "seed money" to CPMCA, but MCA had not. When GBA subsequently withdrew from CPMCA, the organization was unable immediately to refund GBA's $5,000.

## PROCEDURAL BACKGROUND

On October 24, 1995, MCA filed suit against GBA for breach of contract and for a declaratory judgment that the Contract was a binding and enforceable contract.[3] The parties thereafter filed cross-motions for summary adjudication, which the trial court denied on January 7, 1997, on the ground neither party had carried its initial burden of proof under Code of Civil Procedure section 437c.

On March 17, 1997, the first day of trial, GBA filed a motion *in limine* asking the trial court to exclude all of MCA's evidence from trial on the ground the material facts of the case were undisputed and the dispositive issue was purely legal. More specifically, GBA argued that the Contract violated the federal National Labor Relations Act (hereafter NLRA), 29 United States Code section 141 et seq., particularly section 8(d) thereof (hereafter Section 8(d)), and that the Contract was therefore void as a matter of law under Civil Code sections 1608 and 1667.[4] GBA also argued the Contract was invalid as a matter of law because it modified the Agreements between MCA, GBA and the unions; the Agreements required that all modifications be in writing, and the unions had not consented in writing to the Contract. GBA further argued that even if the Contract was not void, the Contract was superseded on July 1, 1994, when MCA, GBA, and Local 467 extended the expiration date of the Agreements with Local 467 (hereafter the Local 467 Agreements) without incorporating the Contract.

MCA argued in opposition that case law supported the proposition that a collective bargaining agreement that requires modifications to be in writing can nonetheless be modified orally, and that the Contract was valid because the unions orally consented to it. MCA also argued that the Contract did not violate federal labor law, and that GBA was estopped by its conduct from asserting that the Contract was void or invalid. MCA argued in the alternative that the Contract should be viewed as an assignment by both parties to each other of their rights to contributions of Funds from members who switch from one association to the other.

On March 18, 1997, the parties filed a stipulation that the case could be tried on all the papers in the trial court's file, including all the documents the

---

[3]On or about May, 16, 1996, GBA sent a letter to MCA terminating the Contract. It thus seems, and MCA does not argue otherwise, that the Contract is no longer in effect.

[4]Civil Code section 1608 provides: "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Section 1667 provides: "That is not lawful which is: [¶] 1. Contrary to an express provision of law; [¶] 2. Contrary to the policy of express law, though not expressly prohibited; or, [¶] 3. Otherwise contrary to good morals."

parties submitted in connection with their cross-motions for summary adjudication. The parties further stipulated that they would waive the presentation of live testimony unless the trial court deemed such testimony necessary, and that the trial court could deem the matter submitted on the basis of GBA's motion *in limine*, MCA's opposition thereto, and such argument that the court wished to hear. On the same day, the trial court held a hearing on GBA's motion *in limine*. The court did not hear any live testimony and, at the end of the hearing, took the matter under submission. The court's minutes of March 18 indicate that the court granted GBA's motion without discussion later that day.

On May 6, 1997, MCA filed a notice of appeal from the trial court's March 18 order, characterizing it both as an appealable order and as a judgment. The record, however, did not contain any signed order of the trial court granting GBA's motion *in limine* or a judgment ending the action. We subsequently notified the parties that we would dismiss this appeal unless they provided us a copy of a final, appealable judgment. On May 18, 1998, the parties filed a judgment, entered by the trial court on March 18, 1997, nunc pro tunc. We accordingly have jurisdiction over this appeal.

DISCUSSION

I. *The Contract Is Not Invalid as a Matter of Law on the Ground It Violates the Requirement in the Agreements That All Modifications Must Be in Writing*

 The first issue we address is whether the Contract is invalid because it modifies the parties' Agreements with Locals 393 and 467 without the unions' written consent. The issue is raised on the following undisputed facts: The parties' Agreements with Locals 393 and 467 each require that all modifications be in writing signed by a duly authorized representative of the union. The Contract modifies the Agreements between MCA, GBA, and the unions. MCA obtained the unions' oral, but not written, consent to the Contract.

Can a collective bargaining agreement be modified orally when it specifies that it may only be modified in writing?

MCA argues that such collective bargaining agreements may be modified orally, relying on *Certified Corp.* v. *Hawaii Teamsters & Allied Workers*

*Wkrs.* (9th Cir. 1979) 597 F.2d 1269 (*Hawaii Teamsters*), a case decided by the United States Court of Appeals for the Ninth Circuit. In *Hawaii Teamsters*, the Ninth Circuit held that a written collective bargaining agreement that contained a clause providing that the agreement could not be modified except in writing could nonetheless be orally modified as to its duration. The court thus applied the general common law rule of contracts that "in the absence of a statute preventing oral modification of a contract, a written contract can *always* be orally modified, even if its express terms prohibit modification except in writing." (*Id.* at p. 1271, italics in original.) The Ninth Circuit recognized that courts do not strictly adhere to common law contract rules when interpreting collective bargaining agreements, but nonetheless reasoned that such a rule, applied in the collective bargaining context, "is not contrary to federal labor policies and in fact effectuates the federal policy of maintaining 'industrial peace.' *See Vaca v. Sipes*, 386 U.S. 171, 182 . . . (1967). It encourages resolution of labor disputes by negotiation rather than by the economic pressure of a strike. . . . *See Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456-[457] . . . (1957); . . . ." (*Hawaii Teamsters, supra*, 597 F.2d at p. 1271, fn. omitted.)

GBA relies on conflicting authority from the United States Court of Appeals for the District of Columbia Circuit in arguing that the Agreements may not be modified except in writing. In *Martinsville Nylon Employees Council v. N.L.R.B.* (D.C. Cir. 1992) 969 F.2d 1263 [297 App.D.C. 263] (*Martinsville*), the court rejected the Ninth Circuit's reasoning, and held that when a collective bargaining agreement requires modifications to be in writing, oral modifications are prohibited. The court's conclusion was not based on cases involving collective bargaining agreements, but instead on the Uniform Commercial Code (hereafter UCC). (*Id.* at p. 1267.) The *Martinsville* court stated: "The drawback of the common law rule is that it denies to all contracting parties, no matter how sophisticated, the ability to decide for themselves whether to restrict the manner in which their agreement may be modified. The UCC rule, on the other hand, enables those parties who mutually value certainty in their relations to have it; under the UCC rule, moreover, no one has to agree to rule out oral modifications nor, having so agreed, are the parties precluded from executing a mutually agreeable modification. [¶] The parties to a [collective bargaining agreement], like 'merchants' within the meaning of UCC § 2-104, are sophisticated. Their agreement is the product of substantive negotiations between intensely interested parties, usually advised by specialized counsel. They ought not be presumed to have included in their agreement a meaningless provision against oral modifications. Nor is there any need to fear that either party may have missed the fine print or somehow been taken advantage of in agreeing that there shall be no oral modifications." (*Ibid.*)

The court in *Martinsville* disagreed with the Ninth Circuit's observation that applying the common law rule would promote industrial peace. The court concluded instead that such a rule would more likely result in increased industrial strife. (*Martinsville, supra,* 969 F.2d at p. 1268.) In addition, the court characterized the Ninth Circuit's holding in *Hawaii Teamsters* as dicta. The court opined that the Ninth Circuit could merely have characterized the modification in that case as an independent oral contract and thereby avoided the question of whether the oral modification was effective. (*Martinsville, supra,* 969 F.2d at p. 1268.)

■ The parties have not cited, and we have not found through independent research, any opinion by the United States Supreme Court or the California Supreme Court discussing this issue. We therefore exercise our independent judgment as to which line of authority controls. (*Alicia T.* v. *County of Los Angeles* (1990) 222 Cal.App.3d 869, 879 [271 Cal.Rptr. 513].) We conclude for several reasons that *Hawaii Teamsters* controls.

First, as MCA argues, were we to adopt a rule different from the Ninth Circuit, we would encourage California litigants to forum shop between California's federal and state courts depending on whether they seek to validate or discredit an oral modification to a collective bargaining agreement. This is a relevant and important consideration that supports adopting the *Hawaii Teamsters* rule. (Accord, *Webb* v. *Superior Court* (1990) 225 Cal.App.3d 990, 1000 [275 Cal.Rptr. 581].)

Second, and more important, we believe, as did Judge Wald in her dissent in *Martinsville,* that *Hawaii Teamsters* is the better reasoned decision. ■ It is the duty of the federal courts to fashion the rules applicable when interpreting collective bargaining agreements. (*Litton Financial Printing Div.* v. *NLRB* (1991) 501 U.S. 190, 202-203 [111 S.Ct. 2215, 2222-2224, 115 L.Ed.2d 177]; *Textile Workers* v. *Lincoln Mills* (1956) 353 U.S. 448, 456-457 [77 S.Ct. 912, 917-918, 1 L.Ed.2d 972] (*Textile Workers*).) Those rules must take into account "the policy of our national labor laws." (*Textile Workers, supra,* 353 U.S. p. 456 [77 S.Ct. at p. 918].) "The federal labor laws seek to promote industrial peace and the improvement of wages and working conditions by fostering a system of employee organization and collective bargaining." (*Vaca* v. *Sipes* (1967) 386 U.S. 171, 182 [87 S.Ct. 903, 912, 17 L.Ed.2d 842]; *McCarroll* v. *L. A. County etc. Carpenters* (1957) 49 Cal.2d 45, 56 [315 P.2d 322].)

In her dissent in *Martinsville,* Judge Wald argued that the goal of industrial peace is better served by allowing flexibility in the performance of a

collective bargaining agreement rather than by maintaining rigid certainty. (*Martinsville, supra,* 969 F.2d at p. 1271 (dis. opn. of Wald, J.).) As support for her position, Judge Wald relied heavily on Justice Goldberg's concurring opinion in *Humphrey* v. *Moore* (1964) 375 U.S. 335 [84 S.Ct. 363, 11 L.Ed.2d 370], in which Justice Goldberg wrote: "There are too many unforeseeable contingencies in a collective bargaining relationship to justify making the words of the contract the exclusive source of rights and duties." (*Id.* at pp. 353-354 [84 S.Ct. at p. 374].)

Justice Goldberg has not been alone in his view of collective bargaining agreements. In *Watson* v. *International Bro. of T., C., W. & H of America* (5th Cir. 1968) 399 F.2d 875, the United States Court of Appeals for the Fifth Circuit stated: "[C]ollective bargaining agreements . . . involve the triangle of often diverging interests of employers, unions, and employees covering a wide range of conduct and an enormous variety of problems. The necessary task of filling in the details is inherent. *A collective bargaining contract operates prospectively over a substantial period of time and the parties cannot be expected to foresee all the problems that will develop in an industrial establishment within the period of the contract and more scope must be left for decisions made in the course of performing the agreement. The parties to the collective bargaining agreement share a degree of mutual interdependence for the cost of disagreement is great and the pressure to reach agreement is so intense that the parties are willing to contract with the thought in mind of working out the problems of interpreting and amending when the inevitable problems arise.*" (*Id.* at p. 879, fn. omitted, italics added.)

■ Our court has recognized the need for flexibility in the performance of collective bargaining agreements. In *Rebeiro* v. *Nor-Cal Integrated Ceilings* (1982) 135 Cal.App.3d 522 [187 Cal.Rptr. 256], the court stated: " '[A] collective bargaining agreement is not an ordinary contract' (*John Wiley & Sons* v. *Livingston* (1963) 376 U.S. 543, 550 . . . [)] and is not governed by the common law concepts that control private contracts. (*Carpenters 46 Northern Cal. Counties Conf. Bd.* v. *Valentine* (1982) 131 Cal.App.3d 534 . . . .) '[I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.' (*Steelworkers* v. *Warrior & Gulf Co.* (1959) 363 U.S. 574, 578 . . . .)" (*Rebeiro* v. *Nor-Cal Integrated Ceilings, supra,* 135 Cal.App.3d at p. 532, italics added.)

GBA argues that the desire for flexibility is satisfied by allowing the parties to a collective bargaining agreement to decide how the agreement may be modified. We disagree because, as the above cited authorities

persuasively demonstrate, the need for flexibility stems from the fact that the parties to a collective bargaining agreement cannot anticipate every problem that may arise *after* an agreement is entered into. We agree with Judge Wald and the *Hawaii Teamsters* court that the goal of industrial peace is better served by allowing the parties to a collective bargaining agreement to modify the agreement orally even if the agreement contains a provision requiring modifications to be in writing.

We disagree with the *Martinsville* majority on three other points as well. First, we join Judge Wald in questioning the *Martinsville* majority's comparison of collective bargaining agreements to standard commercial sales contracts. As the authorities cited by Judge Wald demonstrate, labor law experts dispute the majority's implicit conclusion that collective bargaining agreements are sufficiently similar to standard sales contracts as to justify application of the UCC. (*Martinsville, supra,* 969 F.2d at p. 1271, fn. 1, and authorities cited therein.) Indeed, the United States Supreme Court has recognized that " '[a] collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such private contracts.' " (*Consol. Rail Corp.* v. *Railway Labor Executives* (1989) 491 U.S. 299, 311 [109 S.Ct. 2477, 2485, 105 L.Ed.2d 250].)

Second, while application of the *Hawaii Teamsters* rule may render the modification-in-writing provision in a collective bargaining agreement meaningless, the *Martinsville* majority overstated the significance of this concern. (See *Martinsville, supra,* 969 F.2d at p. 1267.) It is well settled that courts do not rigidly apply the normal rules of contract interpretation when interpreting collective bargaining agreements. (*Hawaii Teamsters, supra,* 597 F.2d at p. 1271; *Rebeiro* v. *Nor-Cal Integrated Ceilings, supra,* 135 Cal.App.3d at p. 532.) Thus, the fact that the modification-in-writing provision of a collective bargaining agreement ultimately may be unenforceable does not justify inflexible adherence to it.

Third, the *Martinsville* majority's characterization of the *Hawaii Teamsters* decision as dicta is ironic in light of the fact that the majority stated plainly that it did not have to decide whether to choose between the UCC rule and the common law rule applied in *Hawaii Teamsters* because the collective bargaining agreement at issue in *Martinsville* contained an "entire agreement" clause. The *Martinsville* court stated: "Whatever the ultimate merits of the common law rule denying effect to the no-oral-modification clause, by including the entire agreement clause the parties here made clear beyond

doubt their intention not to be bound to any informal arrangement to which they might voluntarily adhere during the term of their CBA." (*Martinsville, supra,* 969 F.2d at p. 1268.) Thus, the *Martinsville* majority's expressed preference for the UCC rule in this context may itself be characterized as dicta.

We reject GBA's assertion that we should disregard *Hawaii Teamsters* because it is a "legal dinosaur." GBA cites no authority, nor are we aware of any, that makes the mere age of an opinion relevant in determining its precedential value. As our foregoing discussion demonstrates, the logical force of *Hawaii Teamsters* has not diminished over time. Moreover, contrary to GBA's assertion, the *Hawaii Teamsters* rule has been cited with approval fairly recently by at least two other federal circuit courts of appeal and one federal district court. (See *Merk* v. *Jewel Food Stores* (7th Cir. 1991) 945 F.2d 889, 895; *Eastern Air Lines* v. *Air Line Pilots Ass'n* (11th Cir. 1988) 861 F.2d 1546, 1555; *N.L.R.B.* v. *Deauville Hotel* (11th Cir. 1985) 751 F.2d 1562, 1569, fn. 10; *Local 1316, I. Bro. of E.W.* v. *Superior C. & A.* (N.D.Ga. 1985) 608 F.Supp. 1246, 1250.) And, in fact, two of the cases cited by GBA as supporting the *Martinsville* rule themselves predate *Hawaii Teamsters*. (See *Lewis* v. *Seanor Coal Company* (3d Cir. 1967) 382 F.2d 437; *Gatliff Coal Co.* v. *Cox* (6th Cir. 1945) 152 F.2d 52.) Thus, GBA's characterization of *Hawaii Teamsters* as a "legal dinosaur" is unwarranted and, in any event, unpersuasive.

Finally, GBA cites Civil Code section 1698 as being in accord with *Martinsville*. Section 1698, subdivision (c) provides: "(c) *Unless the contract otherwise expressly provides*, a contract in writing may be modified by an oral agreement supported by new consideration. . . ." (Italics added.)

While Civil Code section 1698, subdivision (c) arguably supports GBA's position, we must keep in mind that we are here dealing with collective bargaining agreements, the interpretation of which is a matter of federal, not state, law. (*Litton Financial Printing Div.* v. *NLRB, supra,* 501 U.S. at pp. 202-203 [111 S.Ct. at pp. 2222-2224]; *Textile Workers, supra,* 353 U.S. at pp. 456-457 [77 S.Ct. at pp. 917-918].) We have acknowledged the split of authority among the federal courts on the issue before us, and have concluded that the better view allows oral modifications of a collective bargaining agreement even if the agreement specifies that modifications must be in writing. Civil Code section 1698, subdivision (c), a state statute, cannot serve to prohibit what federal law allows. (*Allis-Chalmers Corp.* v. *Lueck* (1985) 471 U.S. 202, 210-211 [105 S.Ct. 1904, 1910-1911, 85 L.Ed.2d 206]

(*Allis-Chalmers*);[5] *Fox* v. *General Motors Corp.* (S.D.W.Va. 1994) 859 F.Supp. 216, 219, fn. 5.)[6]

For these reasons, we conclude that the Ninth Circuit's decision in *Hawaii Teamsters* shall control in this case. Consequently, the fact that Locals 393 and 467 did not consent in writing to the Contract does not amount to a violation of the Agreements. The Contract is not invalid as a matter of law on this ground.

II. *Under the Circumstances of This Case, GBA's Contention That the Contract Violates the Notice Requirements of Section 8(d) of the NLRA Cannot Serve as a Ground on Which to Declare the Contract Void*

 GBA also contends the Contract is void because it violates the notice requirements set forth in section 8(d) of the NLRA. The unstated implication is that MCA's alleged violation of section 8(d) is an unfair labor practice under the NLRA.

---

[5]In *Allis-Chalmers,* the United States Supreme Court stated: "If the policies that animate § 301 [of the Labor Management Relations Act] are to be given their proper range . . . , the pre-emptive effect of § 301 must extend beyond suits alleging contract violations. These policies require that 'the relationships created by [a collective-bargaining] agreement' be defined by application of 'an evolving federal common law grounded in national labor policy.' [Citation.] The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort. Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract. [¶] Were state law allowed to determine the meaning intended by the parties in adopting a particular contract phrase or term, all the evils addressed in [*Teamsters* v. *Lucas Flour Co.* (1962) 369 U.S. 95 [82 S.Ct. 571, 7 L.Ed.2d 593]] would recur. The parties would be uncertain as to what they were binding themselves to when they agreed to create a right to collect benefits under certain circumstances. As a result, it would be more difficult to reach agreement, and disputes as to the nature of the agreement would proliferate. Exclusion of such claims 'from the ambit of § 301 would stultify the congressional policy of having the administration of collective bargaining contracts accomplished under a uniform body of federal substantive law.' [Citation.]" (*Allis-Chalmers, supra,* 471 U.S. at pp. 210-211 [105 S.Ct. at pp. 1910-1911].)

[6]This is not to say that no statute could ever preclude oral modification of a collective bargaining agreement. For example, in *Lewis* v. *Seanor Coal Company, supra,* 382 F.2d at page 442, the court held that an oral modification of a provision in a collective bargaining agreement requiring the employer to make payments to a union welfare trust fund was invalid in large part because a federal statute required that the detailed basis on which such payments were to be made had to be specified in writing.

■ "Contracts that are contrary to express statutes or to the policy of express statutes . . . are illegal contracts. [Citation.] Any such illegality voids the entire contract. [Citation.]" (*Green* v. *Mt. Diablo Hospital Dist.* (1989) 207 Cal.App.3d 63, 73 [254 Cal.Rptr. 689].)

Section 8(d) provides, in pertinent part, that "to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—[¶] (1) serves a written notice upon the other party to the contract of the proposed termination or modification . . . [and] [¶] . . . [¶] (3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; . . ." (29 U.S.C. § 158(d)(1), (3).)

■ Here, it is undisputed that MCA did not furnish the unions or the appropriate state and federal agencies with written notice pursuant to Section 8(d) before MCA and GBA executed the Contract. Generally, an employer's failure to provide the notice required under Section 8(d) before modifying or terminating a collective bargaining agreement has been held to be an unfair labor practice. (See *Nabors Trailers, Inc.* v. *N.L.R.B.* (5th Cir. 1990) 910 F.2d 268, 276; *Ariz. Laborers, etc.* v. *Conquer Cartage Co.* (9th Cir. 1985) 753 F.2d 1512, 1516-1517; *McCarroll* v. *L.A. County etc. Carpenters, supra,* 49 Cal.2d at pp. 56-57.)

MCA nonetheless opposes GBA's contention on two grounds. First, MCA contends the notice requirement does not apply to the Contract because the Contract was negotiated only between MCA and GBA and therefore does not constitute "collective bargaining" within the meaning of Section 8(d). At most the Contract is a midterm modification of the Agreements as to which the notice requirement does not apply. Second, MCA contends that the National Labor Relations Board (hereafter NLRB) has exclusive jurisdiction to remedy violations of Section 8(d).

In *N.L.R.B.* v. *Local 554* (7th Cir. 1993) 991 F.2d 1302, the United States Court of Appeals for the Seventh Circuit upheld an NLRB determination that the notice requirements of Section 8(d) do not apply to renegotiations of collective bargaining agreements that take place prior to the natural expiration of the agreements. (991 F.2d at p. 1306.) The court stated: "[T]he [NLRB] concluded that Section 8(d) applies to termination or modification of a collective bargaining relationship taking place after the natural expiration of the labor contract. It does not apply to circumstances of renegotiation taking place prior to the natural expiration of the labor contract. We need not debate the relative policy advantages of requiring or not requiring such notice in cases of renegotiation. Congress left that task to the Board by conferring upon it the responsibility to formulate national labor policy. The Board has spoken decisively in this case against the need for Section 8(d) notice in circumstances of renegotiation. We defer to the Board's conclusion, finding it neither irrational nor inconsistent with the purposes of the Act. There are good reasons not to require notice where the same exigencies which caused the need for renegotiation might make a prolonged notice period impractical." (*N.L.R.B.* v. *Local 554, supra,* 991 F.2d at p. 1306.)

Here, according to GBA's own brief, the Agreements with Local 393 were originally set to expire on June 30, 1995. The Local 467 Agreements were year to year, from July 1 to June 30 of each year. Clearly, the Contract, which was implemented between December 1993 and January 1994, was a midterm modification of those Agreements. It is arguable, therefore, that the notice requirements of Section 8(d) were not applicable. (*N.L.R.B.* v. *Local 554, supra,* 991 F.2d at p. 1306.) Thus, it is not at all clear that MCA committed an unfair labor practice in this case.

This brings us to the main problem with GBA's contention. The NLRB has exclusive jurisdiction to adjudicate disputes involving alleged unfair labor practices. (See *San Diego Unions* v. *Garmon* (1959) 359 U.S. 236, 244-245 [79 S.Ct. 773, 779-780, 3 L.Ed.2d 775]; *Machinists Automotive Trades Dist. Lodge* v. *Peterbilt Motors Co.* (1990) 220 Cal.App.3d 1402, 1407 [269 Cal.Rptr. 911] [". . . where the activity which is the subject of suit is either arguably prohibited or arguably protected by the NLRA, state court jurisdiction must yield to the exclusive jurisdiction of the NLRB"].) Indeed, the United States Supreme Court has stated that "[t]he [NLRB] is vested with primary jurisdiction to determine *what is or is not an unfair labor practice.*" (*Kaiser Steel Corp.* v. *Mullins* (1982) 455 U.S. 72, 83 [102 S.Ct. 851, 859, 70 L.Ed.2d 833], italics added.) Although there are exceptions to this rule of preemption (see, e.g., *Rodriguez* v. *Yellow Cab Cooperative, Inc.* (1988) 206 Cal.App.3d 668, 676-677 [253 Cal.Rptr. 779]), where, as here,

the dispute centers on whether the challenged conduct violated the collective bargaining process itself, none of those exceptions apply (see 29 U.S.C. § 151; *Metropolitan Life Ins. Co.* v. *Massachusetts* (1985) 471 U.S. 724, 753-754 [105 S.Ct. 2380, 2396-2397, 85 L.Ed.2d 728]; *N.L.R.B.* v. *R&H Coal Co., Inc.* (4th Cir. 1993) 992 F.2d 46, 50, fn. 2; *Rodriguez* v. *Yellow Cab Cooperative, Inc., supra,* 206 Cal.App.3d at pp. 676-678).

Accordingly, were we to conclude that MCA committed an unfair labor practice we would be exceeding our jurisdiction and impinging on the jurisdiction of the NLRB. Therefore, in the context of this case MCA's alleged violation of Section 8(d) cannot serve as a basis for this court to declare the Contract void as a matter of law.

III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed. This matter is remanded to the trial court for further proceedings in accordance with the views expressed in this opinion. The parties are to bear their own costs.

Haning, J., and Champlin, J.,† concurred.

Respondent's petition for review by the Supreme Court was denied December 16, 1998.

---

*See footnote, *ante,* page 672.

†Judge of the Napa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.